ORIGINAL

# SECOND AMENDED AND RESTATED

# OPERATING AGREEMENT

# OF

# BRUSHY BROOK DEVELOPMENT COMPANY, LLC

**The membership interests evidenced by this agreement have not been registered under federal or state securities laws and are being issued to members in reliance on exemptions from the registration requirements of those laws. As a result, the membership interests cannot be resold or transferred by any member or other purchaser unless the sale or transfer is registered under those laws or is exempt from registration, and the sale or transfer is otherwise in compliance with those laws. In addition, the sale or transfer of membership interests is subject to restrictions in this agreement.**

# SECOND AMENDED AND RESTATED OPERATING AGREEMENT OF BRUSHY BROOK DEVELOPMENT COMPANY, LLC

Table of Contents


ARTICLE 1 General Provisions ........ 1

Section 1.1. Name. ........ 1

Section 1.2. Place of Business ........ 1

Section 1.3. Definitions ........ 1

Section 1.4. Term, Dissolution and Continuation ........ 1

ARTICLE 2 Members and Status ........ 2

Section 2.1. Members and Units ........ 2

Section 2.2. Limitation Upon Liability of Members ........ 2

Section 2.3. Liability of Management Personnel. ........ 2

Section 2.4. Indemnification ........ 3

Section 2.5. Limitation on Benefits of this Agreement ........ 5

ARTICLE 3 Scope of Company and Management ........ 5

Section 3.1. Scope ........ 5

Section 3.2. Powers of the Company ........ 5

Section 3.3. Dealings With Related Entities ........ 5

Section 3.4. Other Business ........ 6

Section 3.5. Loans to the Company. ........ 6

Section 3.6. Appointment and Power of Manager. ........ 6

Section 3.7. Approval Procedures ........ 8

Section 3.8. Approval or Consent ........ 8

Section 3.9. Non-Participation in Management by Non-Managing Members ........ 9

Section 3.10. Fiscal Year ........ 9

Section 3.11. Records, Accounting and Reports. ........ 9




p.3

Dec 17 04 03:21p

Section 3.12. Right to Inspection. ....... 9
Section 3.13. Holding and Transfer of Assets. ....... 9
Section 3.14. Bank Accounts ....... 9
Section 3.15. Tax Status; Notice of Tax Controversy. ....... 9
Section 3.16. Tax Matters Member; Tax Elections; Tax Returns ....... 9

ARTICLE 4 Capital Contributions ....... 10
Section 4.1. Capital Contributions ....... 10
Section 4.2. Issuance of Class B Units ....... 10
Section 4.3. Issuance of Additional Classes of Units ....... 11
Section 4.4. Non-Cash Contributions ....... 11
Section 4.5. No Preemptive Rights ....... 11

ARTICLE 5 Profits, Losses and Distributions and Capital Accounts ....... 11
Section 5.1. Determination of Distributable Cash ....... 11
Section 5.2. Distributable Cash ....... 12
Section 5.3. Allocation of Profits and Losses. ....... 12
Section 5.4. Capital Accounts ....... 14
Section 5.5. No Interest on Capital Accounts ....... 15
Section 5.6. Return of Capital Contribution ....... 15
Section 5.7. Distribution of Property. ....... 15
Section 5.8. Changes in Interests. ....... 15
Section 5.9. Employment of a Member. ....... 16
Section 5.10. Determination of Profits and Losses. ....... 16

ARTICLE 6 Liquidation ....... 17
Section 6.1. Liquidation Determination ....... 17
Section 6.2. Liquidation Procedure ....... 17
Section 6.3. Allocation of Liquidation Proceeds ....... 17

ARTICLE 7 Transfer of Interests and Changes in Members ....... 18
Section 7.1. Transfer of Members' Interests. ....... 18



p.4

Dec 17 04 03:21p

Section 7.2. Transfer Procedure. ....19
Section 7.3. Effect of Transfer. ....20
Section 7.4. Invalid Dispositions. ....20
Section 7.5. Construction of the Term "Transfer." ....20

ARTICLE 8 Rights of Purchase and Sale ....20
Section 8.1. Rights of Purchase and Sale on Transfer. ....20
Section 8.2. Terms of Purchases and Sales. ....21
Section 8.3. Repurchase Option. ....22

ARTICLE 9 Definitions ....23
Section 9.1. Definitions ....23

ARTICLE 10 Miscellaneous ....26
Section 10.1. Notice. ....26
Section 10.2. Construction ....27
Section 10.3. Assigns and Successors in Interest. ....27
Section 10.4. Amendment ....27
Section 10.5. Further Assurances. ....28
Section 10.6. Warranties of Representatives. ....28
Section 10.7. Counterparts ....28
Section 10.8. Severability ....28
Section 10.9. Consent of Members and Transferees ....28
Section 10.10. Consent to Jurisdiction. ....28
Section 10.11. Security Interest and Right of Set-Off ....29
Section 10.12. Representations of Members. ....29



Dec 17 04 03:22p p.5

# SECOND AMENDED AND RESTATED OPERATING AGREEMENT OF BRUSHY BROOK DEVELOPMENT COMPANY, LLC

*Preliminary Statement*

This limited liability company was formed by Articles of Organization filed with the Office of the Secretary of State of Indiana on June 4, 2002 and is subject to an Operating Agreement entered into by the sole member that was previously amended and restated. The sole current member desires to amend and restate the existing Amended and Restated Operating Agreement and continue the limited liability company with such changes in the members and in their rights, obligations and interests as are described in this Second Amended and Restated Operating Agreement.

Accordingly, the undersigned agrees to continue this limited liability company and amend and restate the existing Operating Agreement of this limited liability company to provide as follows:

## ARTICLE 1

### General Provisions

**Section 1.1. Name.** The name of the Company is Brushy Brook Development Company, LLC.

**Section 1.2. Place of Business.** The specified office of the Company is as specified in the Articles, or at any other location the Manager may select from time to time.

**Section 1.3. Definitions.** Capitalized terms used in this Agreement and not previously defined have the meanings given to them in Article 9.

**Section 1.4. Term, Dissolution and Continuation.**

(a) The term of the Company is perpetual, unless sooner terminated as provided in subsection (b) of this section.

(b) The Company must be dissolved and, unless continued, its assets must be disposed of and its affairs wound up upon the occurrence of any of the following events:

(i) The Bankruptcy of the Company.

(ii) A voluntary agreement of all the Members at any time to dissolve the Company.

(iii) Entry of a decree of judicial dissolution of the Company pursuant to the provisions of the Act.

(iv) The sale or other disposition (other than a disposition occurring upon a financing or refinancing) of all or substantially all of the assets and properties of the Company.

(c) Notwithstanding any other provisions of this section, in the event the Company is liquidated within the meaning of subsection (2)(ii)(g) of the Partnership Allocation Regulations but where the Company is continued, the Company's assets will not be liquidated, the Company's liabilities will not be paid or discharged, and the Company's affairs will not be wound up. Instead, the Company shall be deemed to have contributed its assets to a new successor company, and immediately thereafter the Members shall be deemed to have received interests in the successor company in liquidation of the Company without effecting any change in the ownership of interests in the Company or the successor company as a result of such contribution and liquidation.

(d) A dissolution of the Company pursuant to the Act by consent of two-thirds (2/3) of each class or group of Members constitutes a breach of this Agreement by all Members consenting to such dissolution as against all Members not so consenting.

## ARTICLE 2

### Members and Status

**Section 2.1. Members and Units.** The Members of the Company consist of the Persons who own Units and are identified as Members on *Exhibit A* to this Agreement. The Units are divided into Class A Units, Class B Units and Class C Units, which have identical terms except as specified to the contrary in this Agreement. Additional Members may be added and Units issued by amendment of *Exhibit A* as provided in this Agreement.

**Section 2.2. Limitation Upon Liability of Members.** It is the intent of this Agreement that the liability of the Members is limited to the full extent stated in the Act. Accordingly, a Member is not personally liable to the Company (except for obligations under this Agreement to make Capital Contributions), to the other Members, to the creditors of the Company or to any other third party:

(1) for the losses, debts or liabilities of the Company unless the Act specifically provides that the Member is liable; or

(2) for or on account of any negative balance in the Member's Capital Account.

**Section 2.3. Liability of Management Personnel.**

(a) Notwithstanding anything to the contrary in this Agreement, a Management Official is not liable for monetary damages to the Company, any Members or any Assignees for losses

sustained or liabilities incurred as a result of errors in judgment or any act or omission if the Management Official acted in good faith. A Management Official is not responsible for any misconduct or negligence on the part of an agent or employee appointed by the Management Official in good faith.

(b) Any amendment or repeal of all or any part of this section will be prospective only and does not in any way affect the limitations on the Management Officials' liability to the Company and the Members under this section as in effect immediately prior to such amendment or repeal with respect to claims arising from or relating to matters occurring, in whole or in part, prior to such amendment or repeal, regardless of when such claims may arise or be asserted.

(c) A Management Official may rely and is protected in acting or not acting upon any resolution or other document which the Management Official believes is genuine and has been signed or presented by the proper party or parties.

(d) A Management Official may consult with legal counsel, accountants and other consultants and advisers selected by the Management Official, and any act taken or not taken in reliance upon the opinion of any such consultants or advisers as to matters which the Management Official reasonably believes to be within such consultant's or adviser's professional or expert competence is conclusively presumed to have been done or omitted in good faith and in accordance with such opinion.

**Section 2.4. Indemnification.**

(a) Each person now or in the future who is (i) a Management Official, or (ii) a Member, or (iii) an officer, director, shareholder, employee, agent, partner, member or Affiliate of a Management Official or of a Member, or (iv) an officer, employee or agent of the Company, or (v) any such person's successors and assigns (any such person, an "Indemnitee") shall be indemnified by the Company against expenses (including, but not limited to, attorneys' fees, related disbursements and removal of any liens affecting any property of the Indemnitee), judgments, fines, and amounts paid in settlement, actually and reasonably incurred by such person in connection with any action, suit or proceeding to which such person may be made a party by reason of such person's status as described above (whether or not continuing to be such at the time of incurring such expense), if

(1) the Indemnitee acted in good faith and in a manner reasonably believed by the Indemnitee to be in, or at least not opposed to, the best interests of the Company; and

(2) with respect to any criminal action or proceeding, the Indemnitee either had:

(A) reasonable cause to believe his or its conduct was lawful; or

(B) had no reasonable cause to believe his or its conduct was unlawful.

The termination of any proceeding by judgment, order or settlement does not create a presumption that the Indemnitee did not meet the requisite standard of conduct set forth in this subsection. The termination of any proceeding by conviction or upon a plea of nolo contendere or its equivalent, or an entry of an order of probation prior to judgment, creates a rebuttable presumption that the Indemnitee acted in a manner contrary to that specified in this subsection.

(b) The Company may pay or reimburse reasonable expenses incurred by an Indemnitee who is a party to a proceeding in advance of the final disposition of the proceeding if the Company receives:

(1) a written affirmation by the Indemnitee of the Indemnitee's good faith belief that the standard of conduct necessary for indemnification by the Company as authorized in this section has been met; and

(2) a written undertaking by or on behalf of the Indemnitee to repay the amount if it is ultimately determined that the standard of conduct has not been met.

(c) An Indemnitee must give the Company notice of any action or proceeding for which indemnification is sought within 14 business days after the Indemnitee has actual notice of the action or proceeding, and the Company is entitled to participate in or direct the defense of the action. The Indemnitee may employ its own counsel in any such case, but the fees and expenses of such separate counsel must be borne by the Indemnitee employing such counsel unless:

(1) the Company has authorized the employment of such separate counsel in writing;

(2) the Company has not employed counsel to direct the defense of the action within a reasonable time after receipt of notice from the Indemnitee; or

(3) the Company is also a party to the action or proceeding and the Indemnitee has reasonably concluded that there are defenses available to it that are not available to the Company.

(d) The indemnification provided by this section is in addition to any other rights which an Indemnitee may have under any agreement, pursuant to any vote of the Members, as a matter of law or otherwise, and continues as to an Indemnitee who has ceased to be associated with the Company in any capacity.

(e) The Company may purchase and maintain insurance, on behalf of any potential Indemnitee and such other persons as the Manager shall determine, against any liability that may be asserted against or expenses that may be incurred by any such person in connection with the Company's activities, regardless of whether the Company would have the power to indemnify such a person against such liability under the provisions of this Agreement.

(f) In no event may an Indemnitee subject the Members to personal liability by reason of the indemnification provisions in this Agreement.

(g) An Indemnitee cannot be denied indemnification in whole or in part under this section because the Indemnitee had an interest in the transaction with respect to which the indemnification applies if the transaction was otherwise permitted by this Agreement.

(h) The provisions of this section are for the benefit of the Indemnitees and their heirs, successors, assigns and administrators and do not create any rights for the benefit of any other persons.

**Section 2.5. Limitation on Benefits of this Agreement.** It is the explicit intention of the Members that:

(1) no one other than the Members, the Company and anyone expressly entitled to be indemnified under this Agreement is entitled to bring any action by or on behalf of the Company to enforce any provision of this Agreement against any Member, a Member's successors and assigns or the Company; and

(2) the covenants, undertakings, and agreements set forth in this Agreement are solely for the benefit of, and are enforceable only by, the Members or their respective successors and assigns as permitted under this Agreement, the Company and, to the extent provided in this Agreement, anyone expressly entitled to be indemnified under this Agreement.

## ARTICLE 3

## Scope of Company and Management

**Section 3.1. Scope.** The purpose of the Company is to engage in any businesses that may be lawfully conducted by a limited liability company organized pursuant to the Act, either alone, or in association with, or as agent or representative for, any other person.

**Section 3.2. Powers of the Company.** Subject to any limitations elsewhere in this Agreement, the Company has all the rights, privileges and powers permitted to be had and exercised by limited liability companies under the Act.

**Section 3.3. Dealings With Related Entities.** A Member, Management Official or any Affiliate of a Member or Management Official may contract or otherwise deal with the Company for the purchase or sale of goods, property or services or for other purposes, and the Company has the power to so contract or deal, if:

(1) the compensation paid for and the terms of the transaction are no less favorable to the Company than compensation charged and terms provided for similar goods, services or property in an arm's-length transaction; and

(2) any goods, services or property furnished to or acquired by the Company are in furtherance of the Company business.

The validity of any transaction, agreement, or payment involving the Company and such an Affiliate otherwise permitted by this Agreement is not affected by the approval of the transaction, agreement, or payment by the Member or Management Official who is otherwise interested in or related to the Affiliate.

**Section 3.4. Other Business.** Nothing in this Agreement or the relationship of the Members in any manner restricts the right of any Manager, any Member, any Affiliate of any Member or Manager or any other person to conduct or participate in any business or activity individually or as an owner of any entity other than the Company without any obligation or accountability to the Company or any other Member, even if such business or activity competes with the business of the Company. Any entity which includes as an owner a Manager, a Member, any Affiliate of a Member or Manager or any other person has the right at any time to own and operate any business of any kind other than the business of the Company, either individually or with one or more parties, and is not required to obtain the consent of any Member or offer to any Member or the Company an interest or right to participate in such other business.

**Section 3.5. Loans to the Company.** If the Company needs additional funds, one or more Members or Management Officials or any Affiliate of a Member or any Management Official may, at the option of the Manager, loan such funds to the Company. Any such loan must be made upon terms and conditions no less favorable to the Company than those upon which a commercial lending institution would make such a loan to an entity with financial and business characteristics similar to the Company.

**Section 3.6. Appointment and Power of Manager.**

(a) Brushy Brook Management Company, LLC, an Indiana limited liability company, is hereby appointed to act as the initial "manager" of the Company within the meaning of the Act and thus as the sole "Manager" within the meaning of this Agreement.

(b) The Manager acting alone has full power and authority to execute any and all agreements and other documents on behalf of the Company, and when a document or agreement has been executed and delivered by the Manager, it is binding on the Company. Anyone dealing with the Company may rely on the authority of the Manager as described in this Agreement and need not inquire into the authority of such person.

(c) Subject to the limitations of this section, the Manager is responsible for the management of the Company's business and has full, exclusive and complete power and discretion, without the need for consent or approval of any Member, to make all decisions and to



p.11

Dec 17 04 03:23p

do all things on behalf of the Company which it deems necessary or desirable, including but not limited to the exercise of all powers of the Company.

(d) Any person, firm or corporation may rely on the certification of Brushy Brook Management Company, LLC as to who the Manager of the Company is and does not need to inquire further. In the event the Manager resigns or is dissolved or is removed under subsection (g), Members holding a majority of the Class A Units may elect a replacement Manager, who need not be a Member. In the event the Manager resigns or is dissolved or is removed under subsection (g) and no replacement Manager is elected, the Members holding Class A Units shall be deemed the "Managers" within the meaning of this Agreement and the "managers" within the meaning of the Act.

(e) The Manager is not personally liable for any liabilities or obligations of the Company as a result of holding the position of Manager.

(f) Nothing in this Agreement precludes the employment, at the expense of the Company, of any management company, agent or other third party to manage or provide other services with respect to the Company's business, subject to the control of the Manager. Any such management company, agent or other third party may be an affiliate of the Company or of the Manager. The Manager may appoint officers or agents with such responsibilities and authority as specified by the Manager. Any officer or agent appointed by the Manager may be removed by the Manager.

(g) Members holding a majority of the Class A Units may remove the Manager as Manager of the Company if (and only if) (i) the Manager or any individual controlling the Manager (A) has been determined in a court of competent jurisdiction to be liable for conduct constituting fraud or been convicted in a court of competent jurisdiction of criminal fraud or theft, whether or not in connection with the business of the Company, or (B) has been grossly negligent or has committed willful misconduct in connection with its or his duties to the Company and such conduct has not been cured after reasonable notice from either such Members holding a majority of the Class A Units or at least three-quarters of the equity owners of such Members, and (ii) any personal guarantees of the Company's obligations by the Manager or any persons controlling or affiliated with the Manager have been released.

(h) Notwithstanding anything to the contrary in this section (but subject to the following sentence), the Manager shall not sell or agree to sell more than 50% of the assets of the Company (measured by fair market value) in a single transaction to a single purchaser or group of affiliated purchasers unless the sale has first been approved by Members holding a majority of the Class A Units. Approval of holders of the Class A Units is not required, however, in the following circumstances:

(1) A personal guarantee by the Manager or any person controlling or affiliated with the Manager of a Company obligation is then outstanding and the Company is in default on any obligation for borrowed money or circumstances exist that, with notice or the lapse of time, will cause the

Company to be so in default; and

(2) Within acceptable business practices the Manager reasonably determines that the Company is unable to pay its debts; and

(3) The Manager reasonably determines that it is in the best interests of all Members to liquidate all or a significant part of the Company's assets.

**Section 3.7. Approval Procedures.** Any matter requiring the consent or approval of all or any portion of the Members is approved if Members entitled to vote on the matter holding the required number of Units consent in writing pursuant to the terms of this Agreement to the proposed action. Alternatively, such a matter shall be submitted to the Members entitled to vote on the matter in the following manner:

(a) Within 30 days of the proper proposal of the matter, the Manager shall send notice of the proposal, its text, and a ballot to each Member entitled to vote on the matter by first class United States mail at the address contained in the records of the Company.

(b) The notice must include the recommendation of the Manager, if any, with respect to the passage or rejection of the proposal and a brief explanation of the reasons for the recommendation.

(c) The ballot supplied with the notice of the proposal must state that:

(1) the vote of each Member entitled to vote is due at the offices of the Company in writing on a date specified on the ballot which is no less than 10 and no more than 30 days from the date of the postmark on the notice; and

(2) those Members whose ballots are not received by the date specified on the ballot are deemed to have voted (A) in accordance with the recommendation of the Manager or, (B) against the proposal if no recommendation was expressed in the notice.

(d) A matter requiring the consent of a specified group of the Members in addition to the consent of a larger group of Members or the Members as a whole may be voted upon using the same notice and ballot, and it is not be necessary for a Member to mark and return multiple ballots to vote in more than one capacity.

(e) If consent is given or the proposal is passed in accordance with the procedure in this section, the Manager is expressly authorized and directed to take the action specified in the consent or proposal.

**Section 3.8. Approval or Consent.** Except as otherwise provided herein, any approval or consent required in this Agreement by Members shall be deemed given upon the affirmative vote

at a meeting, or the execution of a written ballot or consent form indicating consent, by Members holding more than fifty percent (50%) of the Units entitled to vote on such matter.

**Section 3.9. Non-Participation in Management by Non-Managing Members.** Except as specifically provided in this Agreement, the Members (other than any Member who has become the Manager pursuant to this Agreement) shall not act for and on behalf of the Company in any manner whatsoever. A Member who is or has been appointed by the Manager as an officer or other agent of the Manager or the Company and acts in such capacity on behalf of the Company shall not be deemed thereby to be acting in such person's capacity as a Member.

**Section 3.10. Fiscal Year.** The fiscal year of the Company shall be the calendar year.

**Section 3.11. Records, Accounting and Reports.** The books of account and records of the Company shall be located at such place as may be specified by the Manager and shall be kept and maintained on a cash basis in accordance with generally accepted accounting principles.

**Section 3.12. Right to Inspection.** Each Member or his duly authorized agent shall at all reasonable times have access to and the right to inspect and copy any of the books and records of the Company.

**Section 3.13. Holding and Transfer of Assets.** All property, real or personal, owned by the Company shall be deemed to be owned by the Company as an entity, and no Member or Assignee, individually or collectively, shall have any ownership interest in such Company assets or any portion thereof. All Company assets shall be recorded as the property of the Company on its books and records, notwithstanding the name in which legal title to such assets is held.

**Section 3.14. Bank Accounts.** Funds of the Company may be deposited in its name in such bank account or accounts as shall be designated from time to time by the Manager. All withdrawals from Company accounts shall be made upon checks signed by or upon the authorization of the Manager. The Manager may designate one or more persons to sign checks on behalf of the Company.

**Section 3.15. Tax Status; Notice of Tax Controversy.** The Company shall be treated and shall file its tax returns as a partnership for federal, state and municipal income tax and other tax purposes. If any Member receives notice of a tax examination of the Company by federal, state or local authorities, the Member immediately shall give notice thereof to the Tax Matters Member.

**Section 3.16. Tax Matters Member; Tax Elections; Tax Returns.**

(a) The Member listed in *Exhibit A* as the "Tax Matters Member" is hereby designated as the "tax matters partner" of the Company under the Code. Pursuant to Section 6223(c)(3) of the Code, upon receipt of notice from the IRS of the beginning of an administrative proceeding with respect to the Company, the Tax Matters Member shall furnish the IRS with the name, address

and profit interest of each of the Members, provided that such information is provided to the Company by the Members.

(b) The Tax Matters Member is authorized, but not required, to make tax elections on behalf of the Company and to exercise in general such powers as are provided in the Code for a "tax matters partner" of a partnership and specifically to take any action on behalf of the Members in connection with any tax audit or judicial review proceeding to the extent permitted by applicable law or regulations. The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the sole and absolute discretion of the Tax Matters Member, and the provisions relating to indemnification set forth in this Agreement shall be fully applicable to the Tax Matters Member in such capacity.

(c) The Tax Matters Member shall receive no compensation for services performed hereunder. All third party costs and expenses incurred by the Tax Matters Member in performing duties as such (including legal and accounting fees) shall be borne by the Company.

(d) The Tax Matters Member shall arrange for the preparation and timely filing of all returns of Company income, gains, deductions, losses and other items required of the Company for federal and state income tax purposes and shall use all reasonable efforts to furnish, within sixty (60) days of the close of each taxable year, the tax information reasonably required by Members for federal and state income tax reporting purposes.

(e) The Tax Matter Member shall not be liable to any Member or the Company on account of any action taken or not taken so long as the Tax Matters Member shall act in good faith in such capacity.

## ARTICLE 4

### Capital Contributions

**Section 4.1. Capital Contributions.**

(a) The initial holder of the Class A Units shall make a Capital Contribution in property as shown in *Exhibit B* hereto. Each other person to whom Units are issued shall make a Capital Contribution as agreed by the Manager and such person.

(b) From and after the date hereof, except as provided in this Article, the Members holding Class A Units shall not be obligated to make further contributions to the Company.

**Section 4.2. Issuance of Class B Units.**

(a) At the election of the Manager, the Company is permitted to issue up to an aggregate of 500 Class B Units and Class C Units (with no more than 160 of such Units to be Class B Units) for any Company purpose at any time or from time to time, to the Members or to other persons for such consideration in the form of Capital Contributions and on such terms and conditions as shall be established by the Manager.

(b) Unless specifically and expressly agreed to the contrary by the Company and a Member, no Member holding Class B Units or Class C Units is obligated to make further contributions to the Company after the Member has made the initial Capital Contribution agreed upon in connection with the issuance of the applicable Class B Units or Class C Units.

**Section 4.3. Issuance of Additional Classes of Units.** At the election of the Manager, the Company is permitted to issue additional classes of Units with distribution and/or governance rights which may differ from the Class A Units and/or Class B Units and Class C Units for any Company purpose at any time or from time to time, to such persons for such consideration in the form of Capital Contributions and on such terms and conditions as shall be established by the Manager. If the Manager causes the Company to issue such a new class of Units, the Manager shall cause this Agreement to be amended, without the need for consent by any other Member, to establish the terms of such interests. Any such amendment may include modifications of the distribution and allocation provisions of Article 5 to account for the economic rights of such Units and of the governance provisions of Article 3 to account for any voting or similar rights.

**Section 4.4. Non-Cash Contributions.** If any part of a Capital Contribution is made other than in cash, the fair market value of such a Capital Contribution for purposes of determining Capital Accounts at the time of contribution will be the agreed value of such property as set forth in an agreement between the Company and the person making the Capital Contribution or, in the case of any contributed property for which there is no agreed value so set forth, the fair market value of such property or other consideration at the time of contribution as determined by the Manager using any reasonable method of valuation, reduced by any liabilities either assumed by the Company upon such contribution or to which such property is subject when contributed.

**Section 4.5. No Preemptive Rights.** No person as a result of holding Class A Units or Class B Units or Class C Units shall have any preemptive, preferential or other similar right with respect to (i) additional Capital Contributions or loans to the Company, or (ii) issuance or sale of any Units.

## ARTICLE 5

### Profits, Losses and Distributions and Capital Accounts

**Section 5.1. Determination of Distributable Cash.** For any fiscal period, the cash available under this Agreement for distribution (the "Distributable Cash"), if any, shall be determined by the Manager in its sole discretion.

**Section 5.2. Distributable Cash.**

(a) For each year, the Company shall distribute cash to each Member in amounts equal to 40% (or such other percentage as the Manager deems reasonable) of the Profit for the year allocated to such Member for federal and state income tax purposes; however, solely for this purpose, Profit shall not include Profits allocated pursuant to Section 5.3(a)(iii) and (iv), representing Profits allocated to match preferred Distributions. In determining the amount of cash to be distributed to each Member under this subsection, the Manager may take into account (i) Losses from prior years which may be available to a Member to reduce the Member's tax liability and (ii) allocations of gain under Section 704(c) of the Code. This distribution shall be made in periodic installments as needed by the Members to pay estimated taxes. Distributions under this subsection (a) arising from undistributed preferential allocations of Profits are deemed pro tanto distributions of the undistributed preferential amounts.

(b) The Company shall then pay to the holders of Class A Units, pro rata according to their respective ownership of Class A Units, a preferred cash distribution (reduced as required to offset deemed distributions of preferential allocations under subsection (a)) of $225,000 for the year ending December 31, 2004, $300,000 for the year ending December 31, 2005, $375,000 for the year ending December 31, 2006 and $450,000 for the year ending December 31, 2007.

(c) The Company shall then pay to the holders of Class B Units, pro rata according to their respective ownership of Class B Units, a preferred cash distribution equal to the then applicable Net B Return Amount and to the holders of Class C Units, pro rata according to their respective ownership of Class C Units, a preferred cash distribution equal to the then applicable Net C Return Amount. To the extent the amount of Distributable Cash available is insufficient to pay both the entire Net B Return Amount and the entire Net C Return Amount, the Distributable Cash shall be distributed between the holders of Class B Units as a group and the holders of Class C Units as a group in proportion to the respective amounts of the Net B Return Amount and the Net C Return Amount.

(d) Additional distributions of Distributable Cash shall be made to the Members at such times and in such amounts as determined by the Manager. Distributions of Distributable Cash to holders of a class of Units shall be made pro rata in accordance with the ownership of Units of that class. The Manager may distribute Distributable Cash to holders of a class of Units without also distributing Distributable Cash to holders of any other class of Units, except that any distribution to holders of Class B Units or Class C Units must be made to holders of both Class B Units and Class C Units. Any distribution of Distributable Cash to holders of Class B Units and Class C Units under this subsection (d) will constitute a return of capital which reduces the Net Capital Contribution with respect to such Units.

**Section 5.3. Allocation of Profits and Losses.**

(a) After giving effect to the Special Allocations, including chargebacks of minimum gain, for each fiscal year of the Company or portion of a fiscal year, all Profits shall be allocated as follows:

(i) Profits shall first be allocated to the Members to offset any net Losses allocated pursuant to subsection (b)(v) below;

(ii) Profits shall then be allocated to the Members to offset any net Losses allocated pursuant to subsection (b)(iv) below;

(iii) Profits shall then be allocated to the holders of the Class A Units in an amount equal to the lesser of (A) remaining Profits or (B) the amount paid for the preferred Distribution under Section 5.2(b);

(iv) Profits shall then be allocated to the holders of the Class B Units and Class C Units in an amount equal to the lesser of (A) remaining Profits or (B) the amount paid for the preferred Distributions under Section 5.2(c);

(v) Any remaining Profits shall then be allocated to the holders of the Class A Units in accordance with their respective ownership of Class A Units.

(b) For each fiscal year of the Company or portion of a fiscal year, all Losses shall be allocated to the Members as follows:

(i) First, Losses shall be allocated to the Members to offset any net Profits allocated pursuant to subsection (a)(v);

(ii) Losses shall then be allocated to the Members to offset any net Profits allocated pursuant to subsection (a)(iv);

(iii) Losses shall then be allocated to the Members to offset any net Profits allocated pursuant to subsection (a)(iii);

(iv) Losses shall then be allocated to each Member having a positive balance in its Capital Account in the proportion that such Member's positive Capital Account balance bears to the total of all positive Capital Account balances of Members until all such positive Capital Account balances equal zero; and

(v) Finally, Losses shall be allocated to the Members according to their Percentage Shares.

(vi) Notwithstanding the provisions of this subsection (b), in accordance with subsection (2)(ii)(d) of the Partnership Allocation Regulations, the allocation of loss, deduction or Code Section 705(a)(2)(B) Expenditures to a Member shall not exceed the maximum amount that can be so allocated without causing a violation of the alternate test of economic effect.

(c) In connection with any Capital Transaction treated as an installment sale, Profits or Losses shall, for purposes of adjusting the Members' respective Capital Accounts, be allocated under the foregoing provisions of this section as though the principal amount of the deferred obligation were received in full at the time of sale. In connection with any Capital Transaction properly treated as an installment sale under the Code, the portion of the Profits or Losses in each installment allocable to a given Member shall, for federal income tax purposes, be in proportion to the Member's total share of Profits or Losses from the Capital Transaction allocated to the Member pursuant to the foregoing provisions of this section.

(d) For purposes of this section, the determination of a Member's Capital Account shall be made without taking into account any liabilities treated as a contribution of money pursuant to subsection (2)(iv)(c) of the Partnership Allocation Regulations (if the Company's payment of such liabilities would be treated as a distribution of money pursuant to subsection (2)(iv)(c) of the Partnership Allocation Regulations).

(g) All allocations made pursuant to this section are subject to the Special Allocations set forth in *Exhibit C* to this Agreement. All allocations of Profits and Losses must be made in accordance with the requirements of the Partnership Allocation Regulations.

**Section 5.4. Capital Accounts.**

(a) The Company will maintain for each Member a capital account (a "Capital Account"), equal to (i) the sum of:

(A) the amount of cash such Member has contributed to the Company;

(B) the fair market value of any property such Member has contributed to the Company (net of any liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752) as a Capital Contribution; and

(C) the amount of Profits allocated to such Member;

(ii) reduced by the sum of:

(X) the amount of Losses allocated to such Member;

(Y) the amount of all cash distributed to such Member; and

(Z) the fair market value of any property distributed to such Member (net of any liabilities either assumed by the Member upon such distribution or secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752);

subject, however, to such other adjustments as may be required under the Code and Treasury Regulations, including, but not limited to, increases or decreases to reflect a revaluation of Company property on the Company's books in accordance with the rules of subsection (2)(iv)(f) of the Partnership Allocation Regulations.

(b) Generally, a transferee of Units shall succeed to the Capital Account relating to the Units transferred.

(c) Each Capital Account is to be determined and maintained at all times in strict accordance with all of the provisions of subsection (2)(iv) of the Partnership Allocation Regulations.

(d) The Capital Account of a Member may, under certain circumstances, be an amount less than zero.

**Section 5.5. No Interest on Capital Accounts.** No Member shall be entitled to receive any interest from the Company on the amount of the Member's Capital Account.

**Section 5.6. Return of Capital Contribution.**

(a) Except as provided in this Agreement, no Member is entitled to withdraw any part of its Capital Contribution or to receive any Distributions from the Company. No Member has the right to demand or receive property other than cash in return for the Member's Capital Contribution; and if upon dissolution the Company property remaining after the payment or discharge of debts and liabilities of the Company is insufficient to return all Capital Contributions, no Member shall have any recourse against any other Member.

(b) The Manager is specifically authorized to distribute to the holders of the Class A Units up to $2,400,000 as a return of a portion of their Capital Contribution at such times as the Manager determines in its sole and absolute discretion that cash is available to do so.

(c) At the election of the Manager, the Company shall make Distributions to holders of Class B Units and Class C Units of amounts in their respective Capital Accounts. No such Distribution can be made that would cause a Member's Capital Account to have a balance less than zero.

**Section 5.7. Distribution of Property.** Unless the Members otherwise agree, in the event it becomes necessary to make a Distribution of Company property in kind, then such property shall be transferred and conveyed to the Members, or their assigns, so as to vest in each of them, as a tenant-in-common, a percentage interest in the whole of said property equal to the percentage interest such Member would have received had such property not been distributed in kind.

**Section 5.8. Changes in Interests.** In the event of an increase or a decrease in the interest in the Company of a Member at any time after the Company's initial fiscal year other than at the

end of a fiscal year of the Company, the share of the Profits and Losses and the Distributable Cash of the Company shall be allocated among the persons whose shares are changed in the same ratio as the number of days in such Company fiscal year before and after the date of such transfer, except that sale Profits and Losses, refinancing proceeds and the gain, loss and proceeds arising out of other extraordinary transactions shall be credited to the person who is a Member as of the date of such event.

**Section 5.9. Employment of a Member.** If a Member is employed by or retained by the Company in any capacity, compensation to such Member shall be deemed to be for services rendered not in the Member's capacity as a member of the Company, and it shall be treated for federal income tax purposes as a payment described by either Section 707(a) or 707(c) of the Code.

**Section 5.10. Determination of Profits and Losses.** For purposes of this Agreement for each fiscal year or other period, the Company's profits ("Profits") and losses ("Losses") are equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses shall be added to such taxable income or loss;

(2) Any Code Section 705(a)(2)(B) Expenditures not otherwise taken into account in computing Profits or Losses shall be subtracted from such taxable income or loss;

(3) In the event any asset of the Company is distributed to any Member or sold by the Company, the difference on such date between (A) the gross fair market value and (B) either (i) the adjusted basis of the asset for federal income tax purposes, or (2) if the asset is reflected on the books of the Company at a book value that differs from the adjusted tax basis of such asset pursuant to subsection (2)(iv)(d) or (2)(iv)(f) of the Partnership Allocation Regulations, the gross fair market value on the date of the contribution of the asset to the Company or the gross fair market value of the asset on the date of the asset's revaluation on the Company's books, as the case may be (as determined by the Managers) less Depreciation, shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(4) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period; and



p.21

Dec 17 04 03:25p

Notwithstanding anything to the contrary in this section, any items which are specially allocated pursuant to the Special Allocations are not taken into account in computing Profits and Losses.

## ARTICLE 6

### Liquidation

**Section 6.1. Liquidation Determination.** In the event of dissolution where the Company is not continued pursuant to this Agreement or otherwise, the Company shall be liquidated.

**Section 6.2. Liquidation Procedure.** A reasonable time, as determined by the Manager, from the date of an event of dissolution shall be allowed for the orderly liquidation of the assets of the Company and the discharge of its liabilities. Upon the completion of dissolution in accordance with the terms hereof, the Company shall terminate and the Manager shall cause to be executed and filed articles of dissolution of the Company whereupon the Company shall cease to exist in all respects. In the event of a dissolution of the Company, liquidation of the assets of the Company and discharge of its liabilities may be carried out by a liquidation trustee or receiver, who shall be a bank or trust company or other person or firm having experience in managing, liquidating or otherwise handling property of the type then owned by the Company. Such liquidation trustee or receiver shall be designated by the Manager. A liquidation trustee shall not be personally liable for the debts of the Company but otherwise shall have such obligations and authorities as are given the Manager pursuant to this Agreement or as may be agreed upon between the Manager and said liquidation trustee.

**Section 6.3. Allocation of Liquidation Proceeds.** Upon liquidation of the Company, the liquidation proceeds shall be applied and distributed, within the time limits required by the Code, in the following manner and order of priority:

(1) To the payment of liabilities of creditors other than Members and to the expenses of liquidation;

(2) To the setting up of any reserves determined by the Manager to be reasonably necessary for any contingent liabilities of the Company or of any Member arising out of or in connection with a Company liability, which reserves shall be paid over by the Company to an escrow agent or shall be held for the purpose of disbursing such reserves in payment of any such contingent liabilities and the balance of which shall be distributed as otherwise provided in this section at the expiration of such period as deemed advisable by the Manager;

(3) To the payment of any liabilities to the Members (other than Capital Accounts), arising out of or in connection with a Company liability, or if the amount available for such payment is insufficient, a *pro rata* portion thereof; and

(4) The remainder to the Members in accordance with the positive balances in their Capital Accounts.

**ARTICLE 7**

**Transfer of Interests and Changes in Members**

**Section 7.1. Transfer of Members' Interests.**

(a) A Member may sell, transfer, assign, pledge or otherwise dispose of all or any part of such Member's Units only if all of the following requirements are satisfied:

(i) the transfer has been approved by the Manager in its sole discretion;

(ii) the transferee has executed and delivered to the Company an instrument satisfactory to the Manager accepting and agreeing to be bound by this Agreement.

(iii) the transferee has reimbursed the Company for all reasonable expenses, including all reasonable legal fees and charges, incurred by the Company in connection with the transfer.

(iv) the transfer does not cause the Company to violate or breach any agreement with a lender or other third party;

(v) the transfer does not impose any liability on the Company or any Member;

(vi) if requested by the Manager, the transferee has delivered to the Company an opinion of counsel satisfactory to the Manager that the Units may be so transferred in reliance on an exemption from registration under the Securities Act of 1933, as amended, and any applicable state securities statutes;

(vii) if the transferee is a corporation, partnership, limited liability company or other entity, the transferee has delivered to the Company evidence satisfactory to the Manager that the transferee has the authority to enter into this Agreement and become a Member.

(viii) the transfer does not result in any material adverse tax effect on the Company or any Member, including but not limited to impairing the ability of the Company to be taxed as a partnership for federal and state income tax purposes; and

(v) the transfer is effected in compliance with the requirements of this Article, and any rights or options to purchase under this Agreement have expired without exercise or have been waived.

(b) A transferee of Units will be automatically substituted as a Member for the transferor with respect to the Units transferred when all of the conditions in subsection (a) have been satisfied.

**Section 7.2. Transfer Procedure.** A transfer of Units is subject to the following rules:

(1) The terms of the transfer must be set forth in a written instrument signed and dated by the transferor and delivered to and received by the Company.

(2) The effective date of a transfer is the date set forth in the written instrument of transfer.

(3) The Company, the Manager and the Members are entitled to treat the registered Member or any prior transferee with respect to such Units as the absolute owner in all respects and shall incur no liability for Distributions of cash or other property made in good faith to such Member or prior transferee until such time as the written instrument of transfer has been delivered to the Company for registration of the transfer.

(4) A transferee is entitled to receive Distributions of cash or other property from the Company attributable to the Units acquired by reason of such transfer from and after the date of the transfer except as provided in (3) above.

(5) The Profits, Losses, income, expense, deductions or credits attributable to the Units acquired by reason of such transfer for the fiscal year of the Company in progress shall be divided among and allocated between the transferor and transferee of such Units as provided in Section 5.8.

(6) Upon any transfer of Units in violation of this Agreement or unless and until the transferee becomes a Substituted Member as provided in this Article, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, and the transferee is only entitled to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor would otherwise be entitled with respect to the Units transferred.

(7) A transfer of Units is not valid until any options or other purchase rights in Article 8 with respect to such Units have lapsed without exercise.

(8) *Exhibit A* to this Agreement shall be deemed automatically amended to reflect any transfer permitted under this Agreement (whether under this Article 7 or under Article 8), and the Manager shall execute and file with

this Agreement a written form of amendment to reflect any such automatic amendment.

**Section 7.3. Effect of Transfer.** Any transferee of Units holds such Units subject to this Article, in the same manner as a Member and must comply with this Article in connection with any further transfer.

**Section 7.4. Invalid Dispositions.** Any attempted transfer or other disposition of a Unit which does not comply with this Article is ineffective and void, and it will not be recognized by the Company.

**Section 7.5. Construction of the Term "Transfer."** As used in this Agreement, any reference to a transfer of Units includes a voluntary or involuntary sale, assignment, pledge, encumbrance or other disposition or transfer of, or the granting of a security interest in, Units, including without limitation a transfer in connection with a dissolution, merger, consolidation or similar action of a Member or a transferee.

## ARTICLE 8

## Rights of Purchase and Sale

**Section 8.1. Rights of Purchase and Sale on Transfer.**

(a) Triggering Event. For purposes of this section, a "Triggering Event" will consist of any of the following occurrences:

(i) A voluntary transfer of Class B Units or Class C Units.

(ii) The Bankruptcy, dissolution, death, adjudication of incompetence or other similar event of a Member which results in an involuntary transfer of Class B Units or Class C Units.

(b) Primary Option. Upon the occurrence of a Triggering Event, the Company or its assignee shall have an irrevocable option to purchase all or any part of the Units to be assigned in connection with the Triggering Event (the "Primary Option"). A Member proposing to make a voluntary transfer of Class B Units or Class C Units shall give written notice to the Manager and the holders of the Class A Units specifying the name of the proposed transferee(s) and the price and other terms of such proposed sale or transfer. The Company or its assignee may exercise its option to purchase all or any part of the Units to be transferred in connection with the Triggering Event upon the terms set forth in this Article at any time within ninety (90) days after such notice is given or the Manager receives actual notice of the occurrence of another Triggering Event.

(c) Secondary Option. If the Company does not exercise the Primary Option to purchase all of the Units to be transferred in connection with a Triggering Event, the Members holding



p.25 Dec 17 04 03:26p

Class A Units (the "Class A Members") shall have an irrevocable option to purchase the remainder of such Units (the "Secondary Option"). The Class A Members may exercise their option to purchase all or any part of the Units to be transferred in connection with the Triggering Event upon the terms set forth in this Article at any time within thirty (30) days after expiration of the Primary Option. Each Class A Member shall have the right to purchase a pro rata portion of the Units subject to the Secondary Option, based upon the respective Percentage Shares of such Class A Members. If any Class A Member declines to exercise his or her pro rata portion of the Secondary Option, the other Class A Members who exercised their options may purchase such portion pro rata according to their respective Percentage Shares. Notwithstanding the foregoing, the Class A Members may, by unanimous agreement, reallocate their options among themselves in such manner as they desire.

(d) <u>Failure to Purchase All Units</u>. If the Company does not exercise the Primary Option and the Class A Members do not exercise the Secondary Option to purchase all of the Units to be transferred in connection with a Triggering Event, all of such Units may be transferred within ninety (90) days after expiration of the option period for the Secondary Option upon satisfaction of all conditions and requirements to such transfer imposed by this Agreement.

**Section 8.2. Terms of Purchases and Sales.** To the extent not specifically provided in the applicable section of this Article, any right to purchase or sell Units in Section 8.1 will be on the following terms and conditions:

(a) <u>Method of Exercise</u>. The right shall be exercised by the persons having the right by giving written notice of intention to exercise to the transferring Member within the applicable time period.

(b) <u>The Purchase Price</u>. The purchase price of the Units which are Class B Units shall be the Net B Return Amount with respect to such Class B Units as of the date of the closing of the purchase. The purchase price of the Units which are Class C Units shall be the Net C Return Amount with respect to such Class C Units as of the date of the closing of the purchase.

(c) <u>Payment</u>. As soon as reasonably practicable, and in any case no more than ninety (90) days after the receipt of the last timely notice for the applicable purchase right, the transaction shall be closed. The purchase price shall be paid 25% in cash at closing and the balance by a negotiable promissory note payable in five (5) successive annual installments, the first of which shall be due one (1) year after the date of the original payment. The promissory note shall bear interest on the balance thereof remaining unpaid from time to time at the Prime Rate until default and thereafter at such Prime Rate plus two percent (2%) per annum, and shall be due with costs and attorneys' fees and without relief from valuation and appraisement laws. Prepayment may be made at any time without premium or penalty, by certified or cashiers' check or wire transfer of immediately available funds.

(d) <u>Rights in the Units Transferred</u>. Upon receipt of the first payment, each seller shall promptly execute and deliver any and all instruments and documents and perform any and all acts necessary to divest himself or herself of all right, title and interest in the applicable Units



p.26 Dec 17 04 03:27p

and all property of every nature and description belonging to the Company. When a purchase right is exercised by the persons having a right to purchase and the first payment is made, the sellers' interest in the Company shall be terminated and the Company business shall continue with the remaining Members, the persons so purchasing (if other than the Company or the remaining Members), and such other persons as they shall admit as Members.

**Section 8.3. Repurchase Option.**

(a) Option. At any time after June 30, 2008, and from time to time thereafter, the Company or its assignee shall have an irrevocable option (the "Repurchase Option") to purchase all or any part of the outstanding Class B Units and Class C Units at the price per Unit and on the other terms and conditions specified in this Section.

(b) Method of Exercise; Repurchase of Less Than All Class B Units and Class C Units. The Company may exercise its Repurchase Option at any time it is exercisable with respect to a Class B Unit or Class C Unit by providing written notice to the holder of such Unit specifying the Unit or Units to be repurchased and the closing date for the repurchase. In case the Company shall exercise the Repurchase Option at any particular time with respect to less than all outstanding Class B Units and Class C Units, the Manager may select the Units to be repurchased by lot or by any other method determined by the Manager in its sole and absolute discretion to be appropriate.

(c) Purchase Price. The purchase price for any Unit repurchased pursuant to the Repurchase Option is equal to the following:

(i) In the case of a Class B Unit, (A) the Net B Return Amount with respect to such Unit as of the date of closing, plus (B) the Net Capital Contribution with respect to such Unit as of the date of closing, plus (C) $1,250.

(ii) In the case of a Class C Unit, (A) the Net C Return Amount with respect to such Unit as of the date of closing, plus (B) the Net Capital Contribution with respect to such Unit as of the date of closing, plus (C) $1,000.

(d) Payment and Closing. The aggregate purchase price for any Units purchased pursuant to the Repurchase Option shall be paid in cash at the closing, which shall occur at a date and time selected by the Company within ten (10) days after receipt of notice by the holders of such Units that the Company is exercising its Repurchase Option with respect to such Units.

## ARTICLE 9

### Definitions

**Section 9.1. Definitions.** The following terms have the following meanings in this Agreement:

**"Act"** means the Indiana Business Flexibility Act (Ind. Code 23-18), as now or hereafter amended.

**"Affiliate"** means a person who, with respect to another person, directly or indirectly controls, is controlled by or is under common control with such other person. An "Affiliate" shall also include a spouse, any dependent children, and any relation, whether by blood, adoption or marriage, as any of the following: father, mother, son, daughter, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, mother-in-law, brother-in-law, sister-in-law, son-in-law, daughter-in-law, stepfather, stepmother, stepson, stepdaughter, stepbrother, stepsister, half-brother or half-sister.

**"Aggregate B Return Amount"** means an investment return amount with respect to a Class B Unit for the period from the date such Class B Unit became outstanding to the date of measurement equal to fifteen percent (15%) per annum on the Net Capital Contribution respecting such Unit from time to time for the period from the date such Class B Unit became outstanding June 30, 2004 plus twelve percent (12%) per annum for the period from June 30, 2004 to the date of measurement, with all amounts for partial years pro rated based on the actual number of days elapsed in the period.

**"Aggregate C Return Amount"** means an investment return amount with respect to a Class C Unit for the period from the date such Class C Unit became outstanding to the date of measurement equal to twelve percent (12%) per annum on the Net Capital Contribution respecting such Unit from time to time for the period from the date such Class C Unit became outstanding to the date of measurement, with all amounts for partial years pro rated based on the actual number of days elapsed in the period.

**"Agreement"** means this Operating Agreement, as originally executed and as amended from time to time.

**"Articles"** means the Articles of Organization filed by the Company with the Indiana Secretary of State as amended or restated from time to time.

**"Bankruptcy"** means, with respect to a person, the happening of any of the following:



p.28 Dec 17 04 03:27p

(A) The entry by a court or governmental agency having jurisdiction in the premises of a decree or order for relief in respect of the person in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of such person, or for any substantial part of such person's property or ordering the winding up or liquidation of such person's affairs, and such decree or order remaining unstayed and in effect for a period of 60 consecutive days; or

(B) The commencement by the person of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by such person to the entry of an order for relief in an involuntary case under any such law; or

(C) The consent by the person to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of any substantial part of such person's property, or the filing of a pleading in any court of record admitting in writing the inability of the person to pay his, her or its debts as they come due; or

(D) The making by the person of a general assignment for the benefit of creditors.

**"Capital Account"** has the meaning given in Article 5.

**"Capital Contribution"** means the total amount of cash and the net fair market value of noncash consideration contributed to the Company by a person with respect to Units, including all Capital Contributions previously made by any prior Member with respect to such Units.

**"Class A Unit"** means an interest in the Company designated as such which has the terms specified for a Class A Unit in this Agreement.

**"Class B Unit"** means an interest in the Company designated as such which has the terms specified for a Class B Unit in this Agreement.

**"Class C Unit"** means an interest in the Company designated as such which has the terms specified for a Class C Unit in this Agreement.

**"Code"** means the Internal Revenue Code of 1986, as in effect on the date of this Agreement, or as may hereafter be amended or supplemented.

**"Code Section 705(a)(2)(B) Expenditures"** mean expenditures described in Code Section 705(a)(2)(B) and any amounts treated as Code Section 705(a)(2)(B) expenditures under subsection (2)(iv)(i)(2) of the Partnership Allocation Regulations.

**"Company"** means the limited liability company governed by this Agreement.

**"Depreciation"** means for each fiscal year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Company asset is reflected on the books of the Company at a book value that differs from the adjusted tax basis of such asset pursuant to subsection (2)(iv)(d) or (2)(iv)(f) of the Partnership Allocation Regulations, depreciation, amortization, or other cost recovery deductions shall be computed for book purposes with respect to such asset pursuant to subsection (2)(iv)(g) of the Partnership Allocation Regulations.

**"Distributable Cash"** has the meaning given in Article 5.

**"Distribution"** means any cash or property distributed to a Member or transferee arising from Units owned by that person.

**"Losses"** has the meaning given in Article 5.

**"Management Official"** means the Manager, a member or agent of the Manager or any authorized representative of a member of the Manager acting on behalf of the Manager and any officer or agent of the Company appointed by the Manager or otherwise holding office pursuant to this Agreement.

**"Manager"** means Brushy Brook Management Company, LLC, an Indiana limited liability company, and any additions or successors to Brushy Brook Management Company, LLC designated in accordance with this Agreement.

**"Member"** means a person admitted to membership in the Company in accordance with the Act, the Articles and this Agreement, and who has not ceased to be a Member pursuant to the Act, the Articles or this Agreement.

**"Net B Return Amount"** means the Aggregate B Return Amount with respect to a Class B Unit less all Distributions pursuant to Section 5.2(c) in respect of such Unit.

**"Net C Return Amount"** means the Aggregate C Return Amount with respect to a Class C Unit less all Distributions pursuant to Section 5.2(d) in respect of such Unit.

**"Net Capital Contribution"** means the Capital Contribution associated with a Unit reduced by any Distributions to the current or any prior holder of such Unit in

return of the Capital Contribution respecting such Unit, including in the case of a Class B Unit or a Class C Unit, but not limited to, a Distribution under Section 5.2(e) or Section 5.6(c) in respect of such Unit.

**"Partnership Allocation Regulations"** means Treasury Regulations Section 1.704-1(b).

**"Percentage Share"** means, with respect to a Member, the product of 100% and a fraction, the numerator of which is equal to the number of Units owned by the Member and the denominator of which is equal to the total number of outstanding Units.

**"Prime Rate"** means the rate of interest quoted from time to time by *The Wall Street Journal* as the "prime rate" under the heading "Money Rates."

**"Profits"** has the meaning given in Article 5.

**"Special Allocations"** means the provisions in *Exhibit C*.

**"Tax Matters Member"** means the person named as such in *Exhibit A* or any successor thereto appointed by the Members to act as "tax matters partner" for the Company under the Code.

**"Treasury Regulations"** mean the income tax regulations promulgated under the Code as in effect on the date of this Agreement, or as hereafter amended or supplemented (including corresponding provisions of such succeeding regulations).

**"Units"** mean units of interest in the Company, including Class A Units, Class B Units and Class C Units and any other interests established under Section 4.3.

## ARTICLE 10

### Miscellaneous

**Section 10.1. Notice.** All notices, elections, consents and approvals under this Agreement shall be in writing, and shall be effectively given to any Member if delivered to the Member or if mailed by certified mail, return receipt requested, to such Member at the address provided to the Company. Any Member may change his, her or its address for notice by giving notice of such change to the Company.

**Section 10.2. Construction.**

(a) This Agreement shall be governed by and construed in accordance with the internal laws (but not the choice of law rules) of the State of Indiana.

(b) Any reference in this Agreement to a "person" means an individual, firm, partnership, corporation, limited liability company, estate, trust, pension or profit-sharing plan or other entity, unless otherwise required by the context.

(c) Article and section titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

(d) Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural; and the masculine gender shall include the feminine and neuter genders.

(e) In computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or a legal holiday, in which event the period shall run until the end of the next day that is not a Saturday, Sunday or legal holiday.

**Section 10.3. Assigns and Successors in Interest.** Except as otherwise provided herein, this Agreement shall be binding upon and shall run for the benefit of the parties executing this Agreement, and the personal representatives, heirs, legatees, devisees, assigns and successors in interest of the Members.

**Section 10.4. Amendment.**

(a) *Exhibit A* to this Agreement may be amended by the Manager without the consent of the Members to reflect the issuance, transfer or other disposition of any Units as permitted by the Agreement. This Agreement may also be amended by the Manager without the consent of the Members pursuant to Section 4.3. This Agreement may be otherwise amended with the written consent of both (i) the Manager and (ii) Members (which may include the Manager) holding more than fifty percent (50%) of the Units acting as a single class. Notwithstanding the preceding sentence, any amendment which would have any of the following effects must be consented to in writing by each Member whose rights or obligations as expressly provided in this Agreement are directly and adversely affected by such amendment:

(i) Increase a Member's obligation to contribute to the Company or decrease the Capital Account of a Member;

(ii) Alter the method for allocating Profits and Losses;

(iii) Alter the manner of computing Distributions;

(iv) Alter the voting rights or status of Members;

(v) Alter the procedures for amending this Agreement; or

(vi) Alter the provisions of this Agreement relating to transfers of Units or rights of purchase and sale upon a transfer.

(b) Notwithstanding subsection (a), the unanimous consent of the Members is required for any amendment which, in the opinion of counsel for the Company:

(i) Is in violation of the provisions of the Act;

(ii) Would cause the Members to incur liability for the business debts of the Company; or

(iii) Would result in the Company being treated as other than a partnership for federal income tax purposes.

**Section 10.5. Further Assurances.** The Members will execute and deliver such further instruments and do such further acts and things as may be necessary to carry out the intent and purpose of this Agreement.

**Section 10.6. Warranties of Representatives.** Each person executing this Agreement on behalf of a party hereto represents and warrants that he has been fully empowered to execute this Agreement, and that all necessary action for the execution of this Agreement has been taken.

**Section 10.7. Counterparts.** This Agreement may be executed in any number of counterparts or by separate signature pages identified as such, and all of such counterparts or signature pages shall for all purposes constitute an agreement binding on the parties hereto, notwithstanding that all parties are not signatory to the same counterpart or signature page.

**Section 10.8. Severability.** If any provision of this Agreement is declared invalid or unenforceable, the remainder of this Agreement will continue in full force and effect so far as the intent of the parties can be carried out.

**Section 10.9. Consent of Members and Transferees.** By acceptance of Units, each Member and each transferee of a Member expressly consents and agrees that, whenever in this Agreement it is specified that an action may be taken upon the affirmative vote or consent of less than all of the Members, such action may be so taken upon the concurrence of less than all of the Members, and each such Member and transferee is bound by the results of such action.

**Section 10.10. Consent to Jurisdiction.** Each Member, after an opportunity to consult with counsel of his choice, hereby agrees that any and all actions or suits in connection with,

arising out of, or related to this Agreement, the Company or any dealings between them related to the subject matter of the Company or this Agreement (including but not limited to contract, tort, common law and statutory claims) shall, at the Company's discretion, be litigated only in state or federal courts of record located in Franklin County, Ohio. Each Member hereby:

(1) consents and submits to the personal jurisdiction of any state or federal court located within Franklin County, Ohio;

(2) waives any right to transfer or change the venue of any such litigation to a court located outside Franklin County, Ohio, any right to object to venue to the extent any proceeding is brought in accordance with this section or any right to assert the doctrine of "forum non-conveniens;" and

(3) agrees to service of process, to the extent permitted by law, by mail addressed to such Member's then current address as indicated in the records of the Company.

Each of the agreements specified in this section is irrevocable to the fullest extent permitted by applicable law.

**Section 10.11. Security Interest and Right of Set-Off.** Subject to any security interests securing a financing or the obligation to make a capital contribution to the Company (which shall constitute a priority), as security for any withholding tax or other liability or obligation to which the Company may be subject as a result of any act or status of any Member, or to which the Company becomes subject with respect to the Units held by any Member, the Company shall have (and each Member hereby grants to the Company) a security interest in all cash (including sale or refinancing proceeds) distributable to the Member to the extent of the amount of the withholding tax or other liability or obligation, and the Company may offset such liability or obligation against any Distributions to such Member. In the event the Company is required to pay to any state or any subdivision thereof any income or other tax with respect to any Member's allocable share of Company Profits as determined for such tax purposes, the amount of such tax payable shall be recoverable by the Company from such Member by offset against the first cash Distributions otherwise due from the Company to such Member and in any event such Member is obligated to deposit with the Company the funds necessary to pay such tax promptly after demand by the Company. Any unpaid deposits bear interest at the Prime Rate plus two percent (2%).

**Section 10.12. Representations of Members.** Each Member (other than Stone Ridge, Inc.) to whom Units are issued, by executing this Agreement in person or by attorney-in-fact, represents and warrants to the Company as follows:

(a) He has such knowledge and experience in business and financial matters that he is capable of evaluating the merits and risks of his investment in the Company. He is able to bear the risk of loss of his investment in the Company.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amended and Restated Agreement as of April 7, 2003.

***MEMBERS:***

STONE RIDGE, INC.

By: ______________________
William McComb, President

405917.5

**EXHIBIT A**

**(As of April 4, 2003)**

| MEMBER'S NAME | CLASS OF UNITS | NUMBER OF UNITS | PERCENTAGE SHARE |
|---|---|---|---|
| Stone Ridge, Inc. | A | 500 | 100.0% |
| TOTAL | | 500 | 100.0% |

**Tax Matters Member:**

Stone Ridge, Inc.

**EXHIBIT B**

**Capital Contribution of Stone Ridge, Inc.**

Real estate, contract rights and other tangible and intangible assets, subject to certain liabilities assumed by the Company, all of which has an agreed value of $9,100,000.

# EXHIBIT C

## Special Allocation Provisions

**1. Special Allocations.**

(a) The Company shall make the qualified income offset allocation required by the alternate test for economic effect under subsection (2)(ii)(d) of the Partnership Allocation Regulations.

(b) In the event any Member has a deficit Capital Account at the end of any Company fiscal year that is in excess of the amount such Member is obligated to restore to the Company, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible.

(c) The Company shall make as appropriate to the Company and the Members all allocations of nonrecourse deductions and minimum gain chargebacks in accordance with the Code and Treasury Regulations.

**2. Curative Allocations.**

(a) Notwithstanding any other provision of this Agreement, the allocations made pursuant to Section 1 of this Exhibit be taken into account in allocating other Profits, Losses, and items of income, gain, loss, and deduction among the Members so that, to the extent possible, the net amount of such allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the allocations made pursuant to such Section 1 had not occurred.

(b) The Tax Matters Member shall have reasonable discretion, with respect to each Company fiscal year, to apply the provisions of this section in whatever manner is likely to minimize the economic distortions that might otherwise result from the allocations made pursuant to Section 1 of this Exhibit.

**3. Other Allocation Rules.** Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Section 1.752-3(a)(3) of the Treasury Regulations, such excess nonrecourse liabilities shall be allocated among the Members in the manner in which it is reasonably expected (as determined by the Tax Matters Member) that the deductions attributed to those nonrecourse liabilities will be allocated.

**4. Tax Allocations; Code Section 704(c).** In the event any Company property is reflected on the books of the Company at a book value that differs from the adjusted tax basis of such property at the time of its contribution to the Company or its revaluation pursuant to subsection (2)(iv)(d) or (2)(iv)(f), respectively, of the Partnership Allocation Regulations, respectively, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be

allocated among the Members in the manner required by Code Section 704(c) and subsection (4)(i) of the Partnership Allocation Regulations.